UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SAM PARSONS,

                        Petitioner,

        -vs-

JOHN BURGE, Superintendent of Auburn
Correctional Facility,

                       Respondent.
_____

**DECISION AND ORDER**

No. 02-CV-6191

## INTRODUCTION

Petitioner, Sam Parsons ("Parsons"), represented by counsel, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in New York State Supreme Court (Monroe County) on April 21, 1998. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## BACKGROUND

Parsons was indicted by a Monroe County Grand Jury on one count of criminal sale of a controlled substance in the first degree; one count of criminal possession of a controlled substance in the first degree; one count of criminal possession of a controlled substance in the third degree; and one count conspiracy in the second degree. The issue presented by the instant habeas petition is whether the trial court's charge regarding the element of "knowing possession" created a mandatory presumption, thereby unconstitutionally shifting the burden of persuasion from the state to the defendant on that element of the crime of criminal possession of a controlled substance. At Parsons's trial, one of the key issues for resolution by the jury was

-1-

whether petitioner "knowingly possessed" the seized cocaine.  Trial counsel defended on the

theory that Parsons, a person of limited intelligence, essentially was acting as the drug dealer's

"mule" and was not aware of the contents of the package later discovered to contain cocaine.

## I.      Factual History

### A.      Transcripts of Wire-tapped Phone Calls

For about eight months, the Rochester Police Department conducted telephone and visual

surveillance on suspected drug dealer Robert Gray ("Gray") and his associate Steven "Shorty"

Maldonado ("Shorty"). On December 5, 1996, the police obtained information from a wiretapped

conversation between Gray and Shorty and that a drug transaction was scheduled to occur the

following day. On December 6, 1996, at 9:04 a.m., Gray called Shorty and said that he was going

to "send Sam in a couple of minutes."  Gray asked Shorty to "open up" one of his "girls" (bricks

of cocaine) and "make" him "two two dollars and fifty cents and ah [*sic*] half a dollar" (divide up

the cocaine into smaller parcels). Gray said that he was "gonna send [his] boy" over to Shorty's

residence at 434 First Street. Gray told Shorty that he would bring "the change" with him and

asked Shorty to page him "so [he] can tell [his] man to meet [him] right quick."

Gray called Shorty again at 10:34 a.m. Shorty informed Gray that he was waiting for Gray

at "4-3-4" (*i.e.*, 434 First Street). Gray indicated that he was "waiting on" Sam because Sam had

his car and had to give him a ride. Gray told Shorty that they would be there "in a minute."

At 10:41 a.m., Gray called Shorty again. The following exchange occurred:

Robert Gray ("RG"):  Sam, coming right now.
Shorty Maldonado ("SH"):     Yeah, he just got here.
RG:    Okay, I'm on my way so what I'm doing, fitting [*sic*] to meet the dude [the
       buyer, Calvin Jessie] at that number and send him, send down to ride back
       with Sam soon as he come [*sic*].

SH:    What you [*sic*] gonna do?
RG:    Send the money right back with Sam.
SH:    And, eh, what Sam, Sam came to get what?
RG:    What?
SH:    All of this.
RG:    Yeah.
SH:    Allright.
RG:    And then I'm ma [*sic*] send the, the what I owe you I'm ma [*sic*] send that with him right now.

. . .

RG:    So, how many you giving Sam right now?
SH:    Uh, the cracked [*i.e.*, the kilo of cocaine Gray had asked him to open up] and two [intact kilos].

. . .

SH:    You gonna come though?
RG:    Yeah, I'm coming, I was waiting on this guy, I'm waiting on him now, after waiting on Sam.
SH:    Allright.
RG:    Allright.

There was a phone call between Gray and Jessie (no time given in the police log) on December 6 in which Gray told Jessie, "As soon I [*sic*] page you just come right over there on . . . B [*i.e.*, Bernard] Street, you know how I used to do that with my lawyer . . . Sambo."  Gray called Jessie again (no time given) and said, "I'm on Bernard." The transcripts of the foregoing calls were part of the prosecution's discovery, and were included as part of the papers in respondent's appendix of exhibits submitted in connection with the habeas petition.  Apparently, however, there was another phone call at about 9:00 a.m. on December 6 between Gray and Parsons, the transcript of which was introduced at trial.  In that phone call, Gray directed Parsons to take his car for an oil change that morning. The prosecution conceded that Parsons's name was not mentioned in any of the overt "drug talk" recorded in the phone conversations.

**B.**    **Testimony at Trial**

    **1.**    **Calvin Jessie: The Buyer**

Jessie testified that on December 5, he arranged with Gray to purchase some cocaine on December 6.  On the morning of December 6, Jessie went to Bernard Street, parked in front of a blue house, and got into a car with Gray and Parsons. Parsons was on the driver's side. Jessie told Gray that he "wanted the coke," and Gray told Sam to go into the back and pick it up. Parsons went around the back of the house and returned with a brown bag. Jessie looked inside and saw a half kilo of cocaine. Jessie said that he wanted the whole kilo instead. Gray then sent Parsons back to get the whole kilo. Parsons returned to the garage and brought back another bag. Satisfied, Jessie handed Parsons $15,000 in cash. Tr. at 256-63.

Jessie went over to Bernard Street right after Gray called him at about 10:40 a.m. to come pick up the cocaine. Tr. at 277, 300. It would have taken him about fifteen or twenty minutes to get from his house on Elmdorf Avenue to Bernard Street, and he left right after the phone call. Therefore, Jessie would have arrived at Bernard Street at about 11 a.m.

According to Jessie, the cocaine was "in a bag bundled up in a bag" Tr. at 298. It was wrapped up in tape and plastic, with the tape covering all of the cocaine so that it was not visible. *Id.* at 308. Jessie testified that he routinely engaged in drug transactions with Gray and that he picked up cocaine from Parsons on "numerous" occasions. *Id.* at 322. Jessie received five years to life in return for his testimony, saving twenty years off his minimum sentence.

### 2.    Juan Zuluaga: The Supplier

Zuluaga, Gray's supplier of cocaine from Queens, testified that he transported a shipment to Rochester on December 5 and brought it to Shorty Maldonado's residence at 434 First Street at about 5 or 6 p.m. Zuluaga saw Gray, accompanied by Parsons, at First Street on December 6 at about 9 or 10 a.m. (*Note*: This was somewhat inconsistent with the wiretapped telephone

-4-

conversations which placed Parsons at 434 First Street at 10:41 a.m., unaccompanied by Gray.)

According to Zuluaga, Gray took two kilos of cocaine that day, but he did not pay for the cocaine

at the time. Gray and Parsons returned between 3 p.m. and 5 p.m., and Parsons had $39,000 in

cash with him. Zuluaga testified that Parsons always was with Gray during the cocaine

transactions. Tr. at 367-72. Like Jessie, Zuluaga benefitted from his cooperation with the

prosecution and shaved thirteen years off his minimum prison sentence.

### 3.      Ussia and Celorio: The Undercover Officers

Starting at 9:23 a.m., Ussia surveilled Shorty Maldonado's residence at 434 First Street

on December 6. He saw Zuluaga's car (a blue Chevy Monte Carlo) and a light blue van. At about

10:43 a.m., a maroon Buick (Gray's car) pulled up into the driveway of 434 First Street. Parsons

got out of the maroon Buick, looked up and down the street a couple of times, and walked back

up the driveway toward the side door.  At 10:55 a.m., Parsons got back into the maroon Buick.

Ussia did not see if Parsons had anything in his hands. There was no one else in the car at that

time. Tr. at 391-98.

At about 11 a.m. on December 6, Celorio observed the maroon Buick at the intersection

of Hollister Street and Clifford Avenue.  He saw a male black operating the vehicle, but he did

not see anyone else in the car. Celorio followed it to 309 Bernard Street where the car pulled

partway into the driveway. The same male driver was inside the vehicle and Gray was standing at

the rear of the vehicle. Celorio did not know where Gray came from.  Tr. at 433. Celorio was

driving by 309 Bernard Street when he saw Gray outside the maroon Buick. Celorio did not

observe the maroon Buick any further and left the area–apparently, an "investigative decision"

was made to terminate surveillance at that point so that the undercover officers would not "get

made." Tr. at 444. (Presumably, this was the drug sale between Gray and Jessie, as scheduled in the two phone calls between Gray and Jessie. The police did not actually observe the drug deal itself, because they terminated surveillance too early.)

At 11:14 a.m., Ussia observed the maroon Buick southbound on Portland Avenue. Ussia spun around, began trailing it, and followed it to 434 First Street, where it pulled into the driveway.  This time, Gray was driving and Parsons was in the passenger seat. The blue Monte Carlo and light blue van still were parked outside 434 First Street.  At 11:21 a.m., the Buick backed out of the driveway. Ussia followed it to 15 Strathallan Park, one of the properties owned by Gray. At that point Gray exited the vehicle and entered the residence at 15 Strathallan Park. After a few minutes, Gray returned to the vehicle, made a U-turn and left. Ussia ceased surveillance at that time.

### 4.    Douglas Parsons

Petitioner's 37-year-old brother, Douglas, testified for the defense that he lived at 309 Bernard Street in the upstairs apartment with his wife and son.  Douglas testified that his brother did not reside at 309 Bernard Street, but rather lived at 353 Bernard Street with his girlfriend and daughter. Douglas said that his brother used to come visit his parents at 309 Bernard Street a couple of times a week. Douglas stated that although his brother finished high school, he was of marginal intelligence and only received a "special ed" diploma.  Douglas testified that Parsons was "kind of like a slow learner" and had "problems . . . reading." Tr. at 573. The defense theory was that, in light of his low intelligence, Parsons could not form the intent required to commit the crimes with which he was charged.  Parsons's brother also testified that Gray used Parsons as a "stooge" to handle the drugs and money in order to insulate Gray from culpability and that

Parsons would not have known what was in the packages because they were wrapped up and taped.

### C.    The Verdict

The jury returned a verdict convicting Parsons of criminal possession of a controlled substance in the first degree (New York Penal Law §§ 20.00, 220.21) and conspiracy in the second degree (New York Penal Law §§ 20.00, 105.15). Parsons was acquitted of the other charges in the indictment. He was sentenced to concurrent indeterminate sentences, the longest of which was fifteen years to life.

## II.    Procedural History

Parsons appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court, raising a number of issues, only one of which is of concern here. The Fourth Department unanimously affirmed his conviction in a written decision entered September 29, 2000. *People v. Parsons*, 275 A.D.2d 933 (4th Dept. 2000). The New York Court of Appeals denied leave to appeal. *People v. Parsons*, 95 N.Y.2d 937 (2000). Parsons sought a writ of *certiorari* from the United States Supreme Court, which was denied on April 23, 2001. *People v. Parsons*, 532 U.S. 998 (2001).

This habeas petition followed in which Parsons claims only that the trial judge improperly charged the jury regarding the defendant's presumption of knowledge in regard to the possession of a narcotic drug, in violation of *Sandstrom v. Montana*, 442 U.S. 510 (1979).  *See* Petitioner's Memorandum of Law (Docket # ) at 1.

**DISCUSSION**

I.     **Exhaustion**

A petitioner must exhaust all available state remedies either on direct appeal or through a collateral attack of his conviction before he may seek a writ of habeas corpus in federal court.  28 U.S.C. § 2254(b); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995).  The exhaustion of state remedies requirement means that the petitioner must have presented his constitutional claim to the highest state court from which a decision can be obtained.  *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000) (citing *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991)).  A claim is properly exhausted when the state court is fairly apprised of the claim's federal nature and of the factual and legal premises underlying the claim. *Grey*, 933 F.2d at 119-20.

Respondent argues that Parsons has failed to exhaust his claim that the trial court erroneously instructed the jury regarding the presumption of knowledge.  Respondent concedes that Parsons raised this argument in his brief to the Appellate Division on direct appeal but argues that Parsons presented the claim solely as a State law violation. *See* Respondent's Memorandum of Law (Docket # 7) at 1.  Parsons contends that although he did not cite specific provisions of the United States Constitution, he presented the substance of his Federal claim to the state courts.  *See* Petitioner's Memorandum of Law (Docket #8) at 7-8.

Here, Parsons's appellate counsel argued to the intermediate appellate court that "the trial court erred in its granting the prosecution's request for a jury charge on presumption of knowledge." Petitioner's Appellate Brief, Respondent's Appendix of Exhibit ("App.") at 25. The body of the argument contained no references to any federal law or sections of the federal

constitution. Parsons argued that "[t]he Trial Court, over objection, and after completion of the proof, acceded to a request by the prosecution to eliminate the requirement of 'knowing possession' from consideration of the jury." *See* App. at 25.  Parsons complained about the following aspect of the court's charge:

> According to the law, an individual who is in possession of a narcotic drug on or about his person is presumed to know that he possesses a narcotic drug. This inference is based upon the nature of the commodity and the manner in which its traffic is conducted.

Tr. at 683-84. Counsel  noted, "The permitted statutory presumptions are listed in Section 220.25[1] of the Penal Law, and such a presumption as was charged to the jury in no wise [*sic*] is contained therein. To apply such a principle is to deprive the Defendant of his right to a jury determination of the issues presented."  Appellate counsel stated in closing, "By elevating such inference to a presumption, [the trial court] has usurped the function of the Trial Jury, depriving the Defendant of his Constitutional right to a fair trial." *Id.* at 26.

When appellate counsel wrote to the Fourth Department on September 14, 2000, in order to clarify certain issues raised at oral argument, counsel discussed the presumption issue, but did not present any additional argument. *See* App. at 177. In his October 16, 2000 letter seeking leave to appeal to the New York Court of Appeals, appellate counsel did not cite any Federal constitutional provisions or federal law, but stated that "[t]his impermissible blending of the two concepts [of presumption and inference] deprived the Defendant of his Constitutional right to a

---

[1]  Penal Law § 220.25 provides that, subject to certain exceptions, the presence of a controlled substance in an automobile "is presumptive evidence of knowing possession thereof by each and every person in the automobile at the time such controlled substance was found."  N.Y. Penal Law § 220.25(1).  The second presumption authorized by § 220.25 is that the presence of a narcotic drug "in open view in a room, other than a public place, under circumstances evidencing and intent to unlawfully . . . prepare [the drug] for sale . . . is presumptive evidence of knowing possession [of the drug] by each . . . person in close proximity to [the drug]." N.Y. Penal Law § 220.25(2).

fair trial[.]" *See* App. at 184.

Mere invocation of constitutional "magic words" such as "fair trial" and "due process" before the state courts does not always alert them to the federal nature of the claim.  *See Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir. 1984) (State court not apprised of double jeopardy claim where petitioner contended that introduction of certain evidence deprived him of fair trial [sic] and due process of law" (citations omitted)).  Similarly, the Second Circuit has observed that "one reference [to 'constitutional rights'] is insufficient to alert the state courts to a confrontation clause issue."  *Grady v. LeFevre*, 846 F.2d 862, 864 (2d Cir. 1988).[2]

On the other hand, the Second Circuit has held that reference to the federal constitutional provision allegedly contravened does satisfy the *Daye* "fair presentment" standard.  In *Gonzalez v. Sullivan*, 934 F.2d 419 (2d Cir. 1991), the Second Circuit concluded, albeit reluctantly, that the petitioner "arguably complied with the exhaustion requirements set forth in *Daye*" by merely citing to "U.S. Const. amend XIV; N.Y. Const., art. I, § 6" as legal authority for his prosecutorial misconduct claim.  934 F.2d at 423; *see also, e.g.*, *Harris v. Scully*, 779 F.2d 875, 878 (2d Cir. 1985) (petitioner exhausted state court remedies where factual issues in state and federal court were the same, and petitioner cited the Fifth and Fourteenth Amendments, and alleged in at least

---

[2]   The more specific the description of the federal right in question that the state court has before it, the more reasonable it is to conclude that the issue was "fairly presented."  *Daye*, 696 F.2d at 193.  As the *Daye* court explained,

> [t]he greatest difficulty arises when in the state court the petitioner has described his claim in very broad terms, such as denial of a "fair trial."  The concept of fairness embraces many concrete notions, ranging from such fundamental matters as the right of the defendant to know the charges against him, to such lesser interests as his right to have each count of the indictment charge him with no more than one criminal violation. . . . Obviously not every event in a criminal proceeding that might be described as "unfair" would be a violation of the defendant's rights under the Constitution.

*Id.* (citations omitted).

two places that the trial court had committed constitutional error by refusing his requested instruction).

Although Parsons's state appellate brief did not explicitly argue that the challenged instruction ran afoul of due process, the Second Circuit has held that "a habeas petitioner's federal constitutional claims may be considered exhausted when the claims were 'fairly'—though not explicitly—presented to the state courts."  *See Daye v. Attorney General of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971).  According to *Daye*, there are four primary sets of circumstances in which a habeas petitioner may be said to have adequately alerted the state courts to the constitutional nature of his claims:  (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. 696 F.2d at 694.

Parsons argues that he falls within the third *Daye* category based upon his assertion in the leave application to the Court of Appeals that the court's charge concerning knowing possession "mixes language pertaining to permissible inference due to the nature of drug trafficing [*sic*] with rebuttable presumption which is not permitted due to the shifting of the burden of proof to the Defendant."  Petitioner's Memorandum of Law at 8 (citing App. at 183).  Parsons also contends that the challenged portion of the court's charge on possession, in itself, "without question, after several decades of constitutional presumption litigation, set forth facts 'well within the mainstream of constitutional litigation." Petitioner's Memorandum of Law at 8 (citing *Sandstrom*, 442 U.S. 510, *supra*; *Ulster County v. Allen*, 442 U.S. 140 (1979)).

The Court agrees with Parsons that his State appellate brief should have called to mind fundamental due process principles. In his argument that the judge's charge overstepped the bounds delineated by state statute, he noted that "knowing possession" was a necessary element of the crime with which he was charged, and claimed that the instruction had removed "knowing possession" from the jury's consideration. Parsons also argued that, by elevating the inference of knowing possession to a presumption, the trial court usurped the function of the trial jury. These allegations fall squarely within the fundamental due process rule that the prosecution prove every element of the offense. *See*, *e.g.*, *Francis v. Franklin*, 471 U.S. 307, 313 (1985). The Supreme Court reiterated in *Francis* that the "Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Id.* (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Thus, the Court finds that "no reasonable jurist could doubt that the defendant's claim implicated [a] constitutional right." *See Daye*, 696 F.2d at 193; *accord Holland v. Scully*, 797 F.2d 57, 65 (2d Cir.) (petitioner's argument to State court noted that intent was a necessary element of liability as an accessory, and claimed that the supplemental instructions had removed intent from the jury's consideration; this should have called to mind the fundamental due process no person may be deprived of liberty without proof, beyond a reasonable doubt, of every fact necessary to constitute the crime of which he is accused), *cert. denied*, 479 U.S. 870 (1986). Having found that Parsons's jury instruction claim is ripe for habeas review, the Court now turns to its analysis of the claim.

## II.       Legal Standard

To prevail under 28 U.S.C. § 2254, as amended in 1996,[3] a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

In order to invoke AEDPA's deferential review standard, there first must have been an "adjudication on the merits" by the state court. In disposing of Parsons's jury instruction on direct appeal, the Appellate Division held that "contrary to defendant's contention, the court properly instructed the jury that a person who is in actual possession of a narcotic drug is presumed to know that he possessed the drug." *People v. Parsons*, 275 A.D.2d at 935 (citations omitted). The Appellate Division thereby adjudicated the claim on the merits. *See, e.g.*, *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (holding that state court adjudicates a petitioner's federal claim on the merits when it disposes of the claim on the merits and reduces its disposition to judgment).

Under AEDPA, a federal court may not grant habeas relief simply because, in its "independent judgment," the state court applied clearly established federal law "erroneously or incorrectly." *Howard v. Walker*, 406 F.3d 114 (2d Cir. 2005) (quoting *Fuller v. Gorczyk*, 273 F.3d 212, 219 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411)) (some quotation marks

---

[3]  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).

-13-

omitted). Rather, the habeas court must ask whether the state court's ruling was "contrary to" or represented an "unreasonable application of" clearly established Supreme Court precedent. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13; *accord*, *e.g.*, *Howard*, 406 F.3d at 122. A State court decision meets the "unreasonable application" prong of AEDPA if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409.

The Second Circuit has explained that "[i]n determining whether an application was objectively unreasonable, a habeas court does not require that 'reasonable jurists would all agree' that the state court erred; on the other hand, 'the most important point is that an unreasonable application of federal law is different from an incorrect application.'" *Howard*, 406 F.3d at 122 (quoting *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000) (quoting *Williams*, 529 U.S. at 411)) (some quotation marks omitted); *see also Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) ("Some increment of incorrectness beyond error is required."). The Second Circuit has cautioned, however, "that the increment  need not be great; otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" *Francis S.*, 221 F.3d at 111 (quoting *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 889 (3d Cir.), *cert.*

-14-

*denied*, 528 U.S. 824 (1999)). With this analytical framework in place, the Court turns to the merits of Parsons's claim.

### III.    Merits of the Petition

#### A.    Applicable Law

In order to demonstrate "that an erroneous [jury] instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court judgment," a petitioner must show that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. . . .'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also United States v. Frady*, 456 U.S. 152, 169 (1982); *accord United States v. Doyle*,130 F.3d 523, 535 (2d Cir. 1997)).

The analysis of this claim is informed by the Supreme Court's teachings in *Francis* and *Sandstrom*, two seminal cases on the distinction between mandatory and permissive presumptions and their respective effects on the burden of proof. The question before the Supreme Court in *Francis* was almost identical to that presented in *Sandstrom*:  "Whether the challenged jury instruction had the effect of relieving the State of the burden of proof enunciated in [*In re*]*Winship*[, 397 U.S. 358, 364 (1970)] on the critical question of . . . state of mind" by creating a mandatory presumption of intent upon proof by the prosecution of other elements of the offense." *Francis*, 471 U.S. at 313.

#### B.    The Presumption

In the present case, the claimed presumption relates not to intent (as was the case in *Sandstrom* and *Francis*) but to the element of "knowing possession."  At Parsons's trial, the judge charged the jury on knowing possession as follows:

According to the law, an individual who is in possession of a narcotic drug is presumed to know that he possesses a narcotic drug. This inference is based upon the nature of the commodity and the manner in which its traffic is conducted. This means that after consideration of all the evidence in this case, you may presume or infer from the Defendant's physical possession of the narcotic drug that he knowingly possessed the narcotic drug. The fact that you may draw this inference does not shift to the Defendant any burden of proof whatsoever. The burden of proof remains upon the prosecution throughout the case. Before you may return a verdict of guilty, each of you, after careful consideration of all the evidence in this case must be satisfied that the prosecution has proved beyond a reasonable doubt each and every element of the crime.

Tr. at 683-84.

The first sentence quoted above, which states that "an individual who is in possession of a narcotic drug is presumed to know that he possesses a narcotic drug," forms the crux of Parsons's constitutional claim. Parsons contends that this "strong presumption language" unconstitutionally shifted the burden of persuasion from the prosecution to the defense. Parsons argues that the court's subsequent "qualifying language" nevertheless "failed to save the constitutionality of the instructions." Petitioner's Memorandum of Law ("Pet'r Mem.") at 12 (Docket #8).

The Supreme Court has explained that "[t]he most common evidentiary device is the entirely permissive inference or presumption, which allows–but does not require–the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and places no burden of any kind on the defendant." *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 157 (1979) ("*Ulster County*") (citations omitted). Because a "permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof," the jury's application of the "beyond a reasonable doubt" standard is affected only if, under the facts of the case, "there is no rational way" the trier of fact could make the connection permitted by the

-16-

inference." *Id.*

A mandatory presumption, on the other hand, "is a far more troublesome evidentiary device" because it "may affect not only the strength of the 'no reasonable doubt' burden but also the placement of that burden[.]" *Id.* This is because a mandatory presumption tells the jury that it "*must* find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts." *Id.* (emphasis in original) (citations omitted). *See also Francis*, 471 U.S. at 314. "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Id.* (footnote omitted).[4]

The Supreme Court in *Francis* explained that threshold inquiry in ascertaining the constitutionality of a jury instruction which allegedly had the effect of relieving the prosecution of the burden of proof on an element of the offense is to determine nature of the presumption it describes and then determine whether the challenged portion of the instruction creates a mandatory presumption or merely a permissive inference. *Francis*, 471 U.S. at 313-14. The Supreme Court has instructed that "[m]andatory presumptions must be measured against the standards of *Winship* as elucidated in *Sandstrom*." A mandatory presumption runs afoul of the due process clause if it relieves "the prosecution of the burden of persuasion on an element of an

_____

[4] "A mandatory presumption may be either conclusive or rebuttable. A conclusive presumption removes the presumed element from the case once the State has proved the predicate facts giving rise to the presumption. A rebuttable presumption does not remove the presumed element from the case but nevertheless requires the jury to find the presumed element unless the defendant persuades the jury that such a finding is unwarranted." *Francis*, 471 U.S. at 314, n. 2 (citing *Sandstrom*, 442 U.S. at 517- 518).

offense.*" Id.* at 314 (quoting *Patterson v. New York*, 432 U.S. 197, 215 (1977) ("[A] State must prove every ingredient of an offense beyond a reasonable doubt and . . . may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense."); *Sandstrom*, 442 U.S. at 520-524; *Mullaney v. Wilbur*, 421 U.S. 684, 698-701 (1975)). In contrast, a permissive inference does not relieve the prosecution of its burden of persuasion because it "still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." *Francis*, 471 U.S. at 314. Such an inference does not necessarily implicate the concerns elucidated in *Sandstrom* and would violate the Due Process Clause "only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* (citing *Ulster County Court*, 442 U.S. at 157-63).

Here, as in *Francis* and *Sandstrom*, the first sentence of the charge is "cast in the language of command." *Compare* Tr. at 683 ("According to the law, an individual who is in possession of a narcotic drug *is presumed to know* that he possesses a narcotic drug.") (emphasis added) with *Francis*, 471 U.S. at 316 (the jury was instructed that "'acts of a person of sound mind and discretion *are presumed* to be the product of the person's will,'" and that a person "'*is presumed* to intend the natural and probable consequences of his acts'") (emphasis added); *Sandstrom*, 442 U.S. at 515 ("The *law presumes* that a person intends the ordinary consequences of his voluntary acts.") (emphasis added).

The Supreme Court has explained that "[a]nalysis must focus initially on the specific language challenged, but the inquiry does not end there." *Francis*, 471 U.S. at 315. Even "[i]f a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an

element of an offense, the potentially offending words must be considered in the context of the charge as a whole," because other instructions "might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption." *Id.* (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also Sandstrom*, 442 U.S. at 514 (This analysis "requires careful attention to the words actually spoken to the jury . . . , for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction."  In sum, an instruction is constitutionally infirm if "a reasonable juror could have understood the challenged portions of the jury instruction . . . as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element" of knowing possession, and if the "charge read as a whole does not explain or cure the error." *Francis*, 471 U.S. at 325.

In *Sandstrom* and *Francis*, the jurors "'were not told that they had a choice, or that they might infer that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory.'" *Francis*, 471 U.S. at 316 (quoting *Sandstrom*, 442 U.S. at 515) (emphasis in original). In Parsons's case, the judge used the word "may," suggesting that the jury had the option of choosing. According to Parsons, "[c]rucial to the infirmity is the phrase 'you may presume or infer' in the midst of the third sentence." *Id.*  Parsons contends that"[t]he danger existed that the jury interpreted 'presume' and 'infer' to be two different concepts and believed the Judge was giving it the choice between the strong presumption or a simple[,] relatively innocuous inference." *Id.*  Thus, Parsons essentially argues that the choice itself was unconstitutional.   Relying upon *Sandstrom*, Parsons argues that "a jury charge which contains two sets of instructions side by side—one correct and one

containing an impermissible presumption—requires reversal if it cannot be deduced which instruction the jury followed." *Id.* at 12-13; *see Sandstrom*, 442 U.S. at 517 ("[G]iven the lack of qualifying instructions as to the legal effect of the presumption, we cannot discount the possibility that the jury may have interpreted the instruction" in an unconstitutional manner."); *accord, e.g.*, *Francis*, 471 U.S. at 322-23.

Turning to the second sentence of the charge at issue here, the trial judge refers to the presumption described in the first sentence as an "inference." *See* Tr. at 683 ("This *inference* is based upon the nature of the commodity . . . ."). The court then attempts to give a explanation of what the two preceding sentences mean:

> [1] *This means that* after consideration of all the evidence in this case, *you may presume or infer* from the Defendant's physical possession of the drug that he knowingly possessed that narcotic drug. [2] The fact that you may draw this inference does not shift to the Defendant any burden of proof whatsoever. [3] The burden of proof remains upon the prosecution throughout the case.

*See* Tr. at 683 (emphasis added).[5]  I will address each sentence in the above-quoted attempted explanation in turn.

    **1.**      **First sentence: "*This means that* after consideration of all the evidence in this case, *you may presume or infer* from the Defendant's physical possession of the drug that he knowingly possessed that narcotic**

---

[5]  The trial court apparently modeled its language after the suggested instruction contained in New York's pattern jury instructions for criminal trials regarding the statutory presumptions contained in Penal Law § 220.25(1) & (2). *See People v. Gardner*, 163 A.D.2d 892, 893 (4th Dept. 1990) ("The suggested charge on this statutory presumption [*i.e.*, Penal Law § 220.25(1) & (2)] in the Pattern Criminal Jury Instructions, specifically informs the jury that *'the law permits, but does not require, the jury to presume or infer* knowing possession in some circumstances,' that they '*may presume or infer* that the defendant knowingly possessed the narcotic drug . . . or you may reject such presumption or inference' and that 'the fact that you may infer such knowing possession does no shift to the defendant any burden of proof whatsoever." (citing 3 CJI [NY] P.L. § 220.25[2], at 1741-42) (emphasis supplied).

It is interesting to note what the trial court omitted in Parsons's case.  It did not employ the introductory sentence suggested by the pattern jury instructions, *see, e.g., People v. Gardner, supra*.  That sentence would have been helpful since it clearly informs the jury that it is permitted, but not required to presume knowing possession in some circumstances.  Nor did the trial court explicitly state that the jury could reject the presumption or inference.

**drug.”**

In *Francis*, the state urged that the following sentence, which immediately followed the objectionable portion of the charge, was an adequate explanation:  “[a] person will not be presumed to act with criminal intention . . . .” *Id.* (citations omitted; alteration in original).  The Supreme Court found that the statement “did no more than contradict the instruction in the immediately preceding sentence[,]” allowing a “reasonable jury” to have “easily resolved the contradiction in the instruction by choosing to abide by the mandatory presumption.” 471 U.S. at 322.  The Supreme Court explained,

> Language that merely contradicts and does not explain a constitutionally infirm
> instruction will not suffice to absolve the infirmity. A reviewing court has no way
> of knowing which of the two irreconcilable instructions the jurors applied in
> reaching their verdict.

471 U.S. at 322.  The *Francis* court then stated that

> [h]ad the instruction ‘[a] person . . . is presumed to intend the natural and probable
> consequences of his acts,’ been followed by the instruction ‘*this means that* a
> person will not be presumed to act with criminal intention but the jury may find
> criminal intention upon consideration of all circumstances connected with the act
> for which the accused is prosecuted,’ a somewhat stronger argument might be
> made that a reasonable juror could not have understood the challenged language
> as shifting the burden of persuasion to the defendant, *cf. Sandstrom*, 442 U.S., at
> 517 (“[G]iven the lack of qualifying instructions as to the legal effect of the
> presumption, we cannot discount the possibility that the jury may have interpreted
> the instruction” in an unconstitutional manner) . . . . Whether or not such
> explanatory language might have been sufficient, however, no such language is
> present in this jury charge.

*Francis*, 471 U.S. at322-23 (emphasis in original).  In Parsons’s case, the trial judge did use the words “this means that.” The issue remains, however, whether the language that followed the “this means that” was sufficient to explain to the jury what the first part of the charge meant.

Regrettably, the *Francis* decision does not provide much assistance in determining the

sufficiency of any attempted explanation since the Supreme Court did not resolve that issue

there.

In Parsons's case, the judge's choice of words in the "explanation" following "this means

that" leads the Court to question whether a reasonable juror would have understood that he or she

was not required to presume knowledge based upon possession. The trial judge's "explanation"

was a variation of the New York pattern charge, the phrasing of which treats "infer" and

"presume" as synonyms.  The Court notes that the suggested explanatory phrase in *Francis* did

not use "presume" and "infer" as synonyms. In this Court's opinion, the use of the terms "infer"

and "presume" interchangeably is misguided because, in either common or legal parlance, an

"inference" and a "presumption" have significantly different meanings.

For instance, according to Black's Law Dictionary ("Black's"), an "inference" is defined

as follows:

> In the law of evidence, a truth or proposition drawn from another which is
> supposed or admitted to be true. A process of reasoning by which a fact or
> proposition sought to be established is deduced as a logical consequence from
> other facts, or a state of facts, already proved or admitted. Inferences are
> deductions or conclusions which with reason or common sense lead the jury to
> draw from facts which have been established by the evidence in the case. *An
> inference is a deduction of fact that may logically and reasonably be drawn from
> another fact or group of facts found or otherwise established in the action.*

BLACK'S LAW DICTIONARY 700 (6th ed. 1968) (citations omitted) (emphasis supplied).

Black's then defines "presume" as follows:

> *To assume beforehand.* In a more technical sense, to believe or accept upon
> probable evidence. *See* Presumption.

*Id.*  (emphasis supplied).  "Presumption," in turn, is defined in relevant part as follows:

> A presumption is a rule of law, statutory or judicial, *by which a finding of a basic fact gives rise to existence of presumed fact, until presumption is rebutted.*[6]
> . . .
> A presumption is a rebuttable assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact or group of facts found or otherwise established in the action.

*Id.* (internal citations omitted) (emphasis supplied).  As the definitions given in Black's Law Dictionary clearly illustrate, the terms "presume" and "infer" are not equivalent, and their treatment as such presents a possibility of jury confusion. *See People v. Thomas*, 50 N.Y.2d 467, 473 n.* [*sic*] (1980) ("In law, the term 'presumption', though sometimes carelessly employed as a synonym for 'inference', is a most consequential evidentiary concept. In the absence of sufficient rebuttal evidence, a true presumption requires the trier of fact to find that the 'presumed fact' exists.").  The Supreme Court, however, has used the terms interchangeably on occasion. *See Ulster County*, 442 U.S. at 157 ("The most common evidentiary device is the entirely permissive inference or presumption which allows–but does not require–the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant.").  In this Court's view, it is important that the "non-technical" meaning of "presume," ostensibly the one which the average "reasonable juror" would employ in his or her deliberations, is to "assume beforehand." Had the trial court simply said, "this means that you may infer," the issue would be more straightforward. But in light of the different meanings of the two words, Parsons's argument focusing on the inclusion of the word

---

[6] "A mandatory rebuttable presumption does not remove the presumed element from the case if the State proves the predicate facts, but it nonetheless relieves the State of the affirmative burden of persuasion on the presumed element by instructing the jury that it must find the presumed element unless the defendant persuades the jury not to make such a finding." *Francis*, 471 U.S. at 317.  As the Supreme Court noted, "[a] mandatory rebuttable presumption is perhaps less onerous from the defendant's perspective, but it is no less unconstitutional." *Id.*

"presume" as a synonym for "infer" has some force.

**2.     Second sentence: "The fact that you may draw this inference does not shift to the Defendant any burden of proof whatsoever."**

It was proper for the court to state that the fact that the jury could draw the inference did not shift the burden of proof to the defendant. It would have been more helpful if the court specifically had explained that there was no shifting of the burden on the element of knowing possession.

**3.     Third sentence: "The burden of proof remains upon the prosecution throughout the case."**

In *Francis*, for example, the state relied on earlier portions of the charge instructing the jurors that the defendant was presumed innocent and that the prosecution was required to prove every element of the offense beyond a reasonable doubt. *Francis*, 471 U.S. at 319. However, as the Supreme Court explained in *Sandstrom* and reiterated in *Francis*, "general instructions on the State's burden of persuasion and the defendant's presumption of innocence are not 'rhetorically inconsistent with a conclusive or burden-shifting presumption,' because '[t]he jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to [the contested element] could be satisfied.'" *Francis*, 471 U.S. at 319 (quoting *Sandstrom*, 442 U.S. at 518-19 n.7). Thus, this general instruction concerning the presumption of innocence and the prosecution's burden of proof must be discounted. It has no bearing on the Court's analysis of the meaning conveyed by the charge as a whole.

In this Court's view, the interchangeable use of "presume" and "infer" was significantly

confusing, especially because it followed such strong presumption language.  The stated

presumption followed by the "this means that" ultimately presented two contradictory

instructions to the jury. The jury was told that the law presumes that possession is knowing when

the defendant has the drug on his person. The jury was then told that this is an "inference" based

upon the nature of illegal drugs. Next, the jury was told that it could "presume" or "infer"

knowing possession based upon the evidence before it. Lastly, the jury was told that the fact that

it "may draw this inference" did not shift the burden of proof to the defendant.  To "infer" and to

"presume" are not the same thing, but the jury essentially was informed that they are equivalent.

We have no way of knowing what meanings or connotations the jurors assigned to "presume" or

"infer." *See Francis*, 471 U.S. at 324 n.8 ("If such a reasonable possibility of an unconstitutional

understanding exists, 'we have no way of knowing that [the defendant] was not convicted on the

basis of the unconstitutional instruction. *Sandstrom*, 442 U.S. at 526.  For this reason, it has been

settled law since *Stromberg v. California*, 283 U.S. 359 (1931), that where there exists a

reasonable possibility that the jury relied on an unconstitutional understanding of the law in

reaching a guilty verdict, that verdict must be set aside.").  Furthermore, the jury in Parsons's trial

was not explicitly told that it could reject the presumption. That is, the trial court eliminated from

its charge the language suggested in the New York Pattern Criminal Jury Instructions that "the

law permits, but does not require" the jury to employ the presumption.  Nor was the jury

informed that the defendant did not need to rebut the presumption by offering evidence to the

contrary.  Therefore, considering the charge as a whole, this Court finds that a reasonable juror

could have concluded that it was being *instructed* to presume knowledge based upon possession

and that the defense was required to rebut the state's evidence as to petitioner's possession of the

drug. The Appellate Division's holding cannot be squared with the constitutional principles

articulated in *Sandstrom* and *Winship*. The Court finds that the Appellate Division's failure to

recognize the constitutional infirmity in the instruction was contrary to the teachings of

*Sandstrom*, and that Parsons has satisfied the requirements of 28 U.S.C. § 2254(d)(1). In the

alternative, the Court also determines that the Appellate Division's conclusion was objectively

unreasonable and therefore represents an unreasonable application of clearly established Supreme

Court precedent under 28 U.S.C. § 2254(d)(2).

### C.  Harmless Error Analysis

Having found that the state court engaged in an unreasonable application of established

Supreme Court which resulted in constitutional error inuring to Parsons, the Court now must

analyze whether such error was harmless. *Howard*, 406 F.3d at 122 ("If th[e] court finds that the

state court engaged in an unreasonable application of established law, resulting in constitutional

error, it must next consider whether such error was harmless.") (citing *Brecht v. Abrahamson*,

507 U.S. 619, 629-30 (1993)). *Sandstrom* errors have been held to be "trial errors" to which the

harmless error rule applies. *Rose v. Clark*, 478 U.S. 570 (1986) (holding harmless error analysis

appropriate for jury instruction that erroneously charged jury on the element of malice);

*California v. Roy*, 519 U.S. 2 (1996) (holding that a jury instruction that omitted a statement

informing the jury that it must find that defendant had the requisite criminal intent should be

reviewed for harmless error).

When faced with a constitutional violation on direct appeal, a court must reverse the

judgment of the court below unless the constitutional error is "harmless beyond a reasonable

doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). In *Brecht*, 507 U.S. at 637, however, the

Supreme Court set forth a "less onerous" standard for evaluating, on collateral review, the impact of a constitutional error. Pursuant to *Brecht*, a federal court may grant habeas relief on the basis of a constitutional error only if it determines that the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Under the *Brecht* standard, a petitioner should prevail when the trial record is "so evenly balanced that a conscientious judge is in *grave doubt* as to the harmlessness of the error." *O'Neal v. McAnnich*, 513 U.S. 432, 436 (1995) (emphasis supplied). In other words, if the reviewing court's mind is "in virtual equipoise as to the harmlessness" of the error, it must conclude that the error was harmful. *Id.* at 435.

The Second Circuit has reserved the question of which standard of review should apply, in the wake of AEDPA, to the question of whether a non-structural trial error challenged on habeas review is harmless where, as here, the state court itself did not reach the issue of harmlessness. *Howard*, 406 F.3d at 122 (citing *Benn v. Greiner*, 402 F.3d 100, 105 (2d Cir. 2005); *Gutierrez v. McGinnis*, 389 F.3d 300, 306-07 & n.7 (2d Cir. 2004); *Ryan v. Miller*, 303 F.3d 231, 245-46 (2d Cir. 2002)). As the circuit court noted in *Gutierrez*, the Supreme Court, in *dicta*, has applied the *Brecht* standard to such a case. *Benn*, 402 F.3d at 105 (citing *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001)). According to the Second Circuit, another possibility is that, even in the absence of a state court adjudication on harmlessness, the reviewing court should inquire whether the state court's affirmance of the conviction is contrary to, or an unreasonable application of, the *Chapman* standard. 402 F.3d at 105. In *Benn*, the Second Circuit declined to resolve the issue because it found that the result was the same under either standard. *Id.*

-27-

Thus, it remains an open question as to what harmlessness standard applies on habeas review where, as here, the state court has not engaged in a harmless error analysis. After reviewing the transcript of the proceedings below, the Court is of the opinion that, under either standard, the trial judge's erroneous jury instruction did not have a "substantial and injurious effect or influence on the verdict."

In the present case, Jessie, the buyer, stated that although he never purchased cocaine from Parsons by himself, Parsons always was present during Jessie's numerous drug transactions with Gray. Zuluaga also testified that Parsons had been involved in his drug dealings with Gray in the past. In Parsons's favor was the testimony was that the package of cocaine he was accused of possessing was entirely wrapped in plastic and tape and that the cocaine within was not visible. Furthermore, none of the wire-tapped phone conversations implicated Parsons in any explicit "drug talk." However, Jessie testified that on day in question, he got into Gray's car and told Gray that he "wanted the coke." Parsons, who was sitting in the front seat of the car, could not have helped but to hear that statement. The jury reasonably could have inferred that, when Parsons got out of the car and went into the garage, he knew he was retrieving a package of "coke" so that Gray could complete his drug sale to Jessie. Although Parsons apparently was of limited intelligence, the testimony was not that he was so mentally deficient that he would not have understood that he was taking part in a drug sale. Rather, the proof was that Parsons lived independently with his girlfriend and daughter, possessed a driver's license, and had graduated from high school.

Thus, in light of the evidence that Parsons was aware that he was participating in the sale of cocaine, the Court must determine that it was unlikely that the incorrect charge had

"substantial and injurious effect," *Brecht*, 507 U.S. at 623, on the jury's determination of guilt. In other words, the record is not so evenly balanced that the Court finds itself in "grave doubt," *O'Neal*, 513 U.S. at 436, as to the harmlessness of the error. Accordingly, the Court must conclude that Parsons's conviction was not obtained in violation of his constitutional due process rights.

## CONCLUSION

For the reasons set forth above, Sam Parsons's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because Parsons has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253. .

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:        June 10, 2005
              Rochester, New York.